**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**

| | |
|---|---|
| **NOE LAZO ALANIS JR. and IRMA LAZO,**<br><br>**Plaintiffs,**<br><br>**vs.**<br><br>**EQUIFAX INFORMATION SERVICES LLC, EXPERIAN INFORMATION SOLUTIONS, Inc., and TRANS UNION LLC,**<br><br>**Defendants.** | **Civil Action No. 2:26-cv-12980**<br><br>**With Jury Demand Endorsed** |

**COMPLAINT**

TO THE HONORABLE UNITED STATES DISTRICT COURT JUDGE:

Plaintiff, Noe Lazo Alanis Jr. and Irma Lazo ("Plaintiffs"), by and through counsel, for Plaintiffs' Complaint against Defendants Equifax Information Services LLC, Experian Information Solutions, Inc., and Trans Union LLC, jointly, severally, and in solido, state as follows:

## I. INTRODUCTION

1. The Defendants, Equifax Information Services LLC, Experian Information Solutions, Inc., and Trans Union LLC are consumer reporting agencies ("CRAs") as defined by 15 U.S.C. § 1681a(f), and the other unnamed Defendant, Ally Financial Inc., is a furnisher of consumer information. All Defendants have violated 15 U.S.C. § 1681 *et seq.*, known as the Fair Credit Reporting Act (the "FCRA"). Plaintiffs seek to recover from Defendants actual, statutory, and punitive damages, injunctive relief, legal fees, and expenses.

## II. PARTIES

2. Plaintiffs are natural persons residing in Edinburg, Texas, are "consumers," as defined by the FCRA, 15 U.S.C. § 1681a(c), and is a victim of repeated false credit reporting.

**Made Defendants herein are**:

3. Upon information and belief, Defendant Equifax Information Services LLC, which may also hereinafter be referred to as "Equifax," "Defendant," "Defendants," "CRA," "CRA Defendant," or "CRA Defendants" is a Georgia limited liability company that does substantial business in this judicial district and may be served by delivering a summons to its headquarters, 1550 Peachtree Street, Northwest, Atlanta, Georgia 30309. Equifax is a nationwide consumer reporting agency ("CRA") as defined by 15 U.S.C. § 1681a(f). Equifax regularly engages in the business of assembling, evaluating, and disbursing information concerning consumers for the purposes of furnishing "consumer reports" as defined by 15 U.S.C. § 1681a(f) to third parties. Equifax disburses such consumer reports to third parties of contract for monetary compensation.

4. Upon information and belief, Experian Information Solutions, Inc., which may also hereinafter be referred to as "Experian", "Defendant," "Defendants," "CRA," "CRA Defendant," or "CRA Defendants,", does business in this judicial district and is an Ohio corporation with its principal place of business in California. Experian is a nationwide CRA as defined by 15 U.S.C. § 1681a(f). Experian regularly engages in the business of assembling, evaluating, and disbursing information concerning consumers for the purposes of furnishing "consumer reports" as defined by 15 U.S.C. § 1681a(f) to third parties. Experian disburses such consumer reports to third parties of contract for monetary compensation.

5. Upon information and belief, Defendant Trans Union LLC, which may also

hereinafter be referred to as “Trans Union”, “Defendant,” “Defendants,” “CRA,” “CRA Defendant,” or “CRA Defendants” is an Illinois limited liability company that does business in this judicial district and may be served by delivering a summons to its headquarters, 555 West Adams Street, Chicago, Illinois 60681. Trans Union is a nationwide CRA as defined by 15 U.S.C. § 1681a(f). Trans Union regularly engages in the business of assembling, evaluating, and disbursing information concerning consumers for the purposes of furnishing “consumer reports” as defined by 15 U.S.C. § 1681a(f) to third parties. Trans Union disburses such consumer reports to third parties of contract for monetary compensation.

6. Upon information and belief, Defendant Ally is a Michigan company that does substantial business in this Judicial District, and its headquarters is located at 500 Woodward Avenue, Detroit, Michigan 48226. Ally is a “person,” as defined by the FCRA, 15 U.S.C. § 1681a(b), and a furnisher of consumer credit information to consumer reporting agencies.

7. As used herein, “consumer reporting agency,” or “CRA,” means any person which, for monetary fees, dues, or on a cooperative nonprofit basis, regularly engages in whole or in part in the practice of assembling or evaluating consumer credit information or other information on consumers for the purpose of furnishing consumer reports (commonly referred to as “credit reports”) to third parties, and which uses any means or facility of interstate commerce for the purpose of preparing or furnishing consumer reports and is an entity in the business of collecting, maintaining and disseminating information regarding the credit-worthiness of individuals. CRAs specifically include, but are not limited to, Equifax, Experian, and Trans Union.

## III. JURISDICTION AND VENUE

8. Plaintiffs respectfully assert that this Honorable Court has jurisdiction in this case arising under federal law. 28 U.S.C. § 1331, 1334, and 1367 and 15 U.S.C. § 1681(p). Plaintiffs also assert actions under states' laws which may be brought within the supplemental jurisdiction of this Court and Plaintiffs respectfully request that this Honorable Court exercise supplemental jurisdiction over said claims. 28 U.S.C. § 1367.

9. Venue is further proper in this District, because the CRA Defendants entered into agreements with Furnisher in this judicial district to receive credit reporting data concerning Plaintiff. Any and all requests to investigate Plaintiff's dispute sent from the CRA Defendants as part of Defendants' reinvestigations were submitted to Furnisher's headquarters and investigated by Furnisher using its resources located at or closely connected to this judicial district. Furnisher managed Plaintiff's auto loan from this judicial district including communicating amounts owed and conducting numerous communications via phone and letter.

## IV. FACTUAL ALLEGATIONS

10. In around January 2006, Plaintiffs secured a mortgage loan for Plaintiffs' primary residence.

11. In or around November 2016, Plaintiff Irma Lazo secured an auto loan with Capital One Auto Finance Inc. and Capital One Auto Finance Inc. assigned account number 6206170*** (hereinafter the "Capital One Auto loan" or "Capital One Auto account" or "Capital One Auto tradeline").

12. In or around November 2016, Plaintiffs secured an auto loan with Bank of America, N.A. and Bank of America, N.A. assigned account number 650100*** (hereinafter the "BofA loan" or "BofA account" or "BofA tradeline").

13. In or around October 2019, Plaintiffs secured an auto loan with Ally Financial Inc. and Ally Financial Inc. assigned account number 611929*** (hereinafter the "Ally loan" or "Ally account" or "Ally tradeline").

14. Due to unforeseen circumstances, Plaintiffs needed to file for bankruptcy protection under Chapter 13 of Title 11.

15. On or around February 6, 2020, Plaintiffs filed for bankruptcy protection under Chapter 13 of Title 11.

16. A redacted copy of Plaintiffs' chapter 13 bankruptcy docket report for Plaintiffs' bankruptcy case is attached hereto as Exhibit A.

17. Upon information and belief, on or about this time, Plaintiffs' mortgage was sold to, transferred to, purchased by, or otherwise acquired by NewRez LLC DBA Shellpoint Mortgage Servicing and was assigned account number 579332*** (hereinafter the "NewRez Financial loan" or "NewRez account" or NewRez tradeline").

18. As part of Plaintiffs' chapter 13 bankruptcy, it was determined that Plaintiffs were to continue to pay on the Ally loan even after Plaintiffs filed for bankruptcy.

19. The Chapter 13 Plan specifically details that Plaintiffs were to make the auto payments to the Bankruptcy Trustee, and the Trustee would disperse the payments to Mortgage Lender.

20. A redacted copy of Plaintiffs' chapter 13 bankruptcy Plan is attached hereto as Exhibit B.

21. During Plaintiffs' bankruptcy, Plaintiffs timely completed all of the loan payments for the Ally, Capital One Auto, BofA, and NewRez accounts. Plaintiffs are the free and clear owners of the automobile that was the security interest of the Ally, Capital One Auto, and BofA

accounst.

22. On April 18, 2025, the Plaintiffs were discharged from Chapter 13 Bankruptcy.

23. A redacted copy of Plaintiffs' chapter 13 Discharge Order is attached hereto as Exhibit C.

24. Sometime in March 2026, Plaintiffs obtained Plaintiffs' three-bureau credit reports and noticed that the Equifax, Experian, and Trans Union credit report(s) were not accurate. A redacted copy of Plaintiff Noe Lazo Alanis Jr.'s March 3, 2026, tri-merge credit report is attached hereto as Exhibit D.

25. A redacted copy of Plaintiff Irma Lazo's March 3, 2026, tri-merge credit report is attached hereto as Exhibit E.

26. Within the Tri-Merge credit report, Plaintiffs noticed that Equifax reported the following inaccuracies for Plaintiffs' Ally account.

27. The Ally account was reporting a payment status of "Wage Earner Plan", an account rating of "Derogatory", a date of last payment of December 1, 2019, a date of last activity of December 1, 2019, a high balance of $0.00, and within the creditor remarks it was reporting the "Account involved in Chapter 13 debt adj. Auto included in Chapter 13".

28. This reporting is incorrect because Plaintiffs completed all the required loan payments for the Ally account, Plaintiffs are the free and clear owners of the automobile that was the security interest of the Ally account, and the current reporting is a significant misrepresentation of this fully paid and closed account.

29. The accurate reporting of the Ally account would have been to report a payment status of "Current", an account rating of "Paid/Closed", a date of last activity as of the last payment date, a high balance of $23,578, and should have reported within the creditor remarks

section "Auto closed or paid account/zero balance".

30. Within the Tri-Merge credit report, Plaintiff Irma Lazo noticed that Equifax reported the following inaccuracies for Plaintiff's Capital One Auto account.

31. The Capital One Auto account was reporting a payment status of "Wage Earner Plan", an account rating of "Derogatory", a date of last payment of January 1, 2020, a date of last activity of January 1, 2020, a high balance of $0.00, and within the creditor remarks it was reporting the "Account involved in Chapter 13 debt adj. Auto Included in Chapter 13".

32. This reporting is incorrect because Plaintiffs completed all the required loan payments for the Capital One Auto account and the current reporting is a significant misrepresentation of this fully paid and closed account.

33. The accurate reporting of the Capital One Auto account would have been to report a payment status of "Current", an account rating of "Paid/Closed", a date of last activity as of the last payment date and should have reported within the creditor remarks section "Auto closed or paid account/zero balance".

34. Within the Tri-Merge credit report, Plaintiffs noticed that Equifax reported the following inaccuracies for Plaintiffs' BofA account.

35. The BofA account was reporting a payment status of "Wage Earner Plan", a date of last payment of February 1, 2020, a date of last activity of February 1, 2020, a high balance of $0.00, and within the creditor remarks it was reporting the "Account involved in Chapter 13 debt adj. Closed or paid account/zero balance included in Chapter 13".

36. This reporting is incorrect because Plaintiffs completed all the required loan payments for the BofA account Plaintiffs are the free and clear owners of the automobile that was the security interest of the Ally account, and the current reporting is a significant

misrepresentation of this fully paid and closed account.

37. The accurate reporting of the BofA account would have been to report a payment status of "Current", a date of last activity as of the last payment date and should have reported within the creditor remarks section "Auto closed or paid account/zero balance".

38. Within the Tri-Merge credit report, Plaintiffs noticed that Equifax reported the following inaccuracies for Plaintiffs' NewRez account.

39. The NewRez account was reporting a payment status of "Wage Earner Plan", a date of last payment of February 1, 2020, a date of last activity of February 1, 2020, a high balance of $0.00, and within the creditor remarks it was reporting the "Account involved in Chapter 13 debt adj. Closed or paid account/zero balance included in Chapter 13".

40. This reporting is incorrect because Plaintiffs completed all the required loan payments for the NewRez account and the current reporting is a significant misrepresentation of this fully paid and closed account.

41. The accurate reporting of the NewRez account would have been to report a payment status of "Current", a date of last activity as of the last payment date and should have reported within the creditor remarks section "Auto closed or paid account/zero balance".

42. The current reporting of the Ally, Capital One Auto, BofA, and NewRez accounts materially misleads lenders to believe Plaintiffs surrendered the propety that was/is the security interest of the Ally, Capital One Auto, BofA, and NewRez accounts and converted the Ally, Capital One Auto, BofA, and NewRez loans to unsecured debt and discharged the debt by way of Plaintiffs' chapter 13 bankruptcy.

43. The current reporting of the Ally, Capital One Auto, BofA, and NewRez accounts was never an "historically accurate" way to report the Ally, Capital One Auto, BofA, and NewRez

accounts.

44. Within the Tri-Merge credit report, Plaintiffs noticed that Experian reported the following inaccuracies for Plaintiffs' Ally account.

45. The Ally account was reporting a payment status of "Wage Earner Plan", an account rating of "Derogatory", no date of last payment, a date of last activity of February 1, 2020, and within the creditor remarks it was reporting the "Debt included in or discharged through Bankruptcy Chapter 13".

46. This reporting is incorrect because Plaintiffs completed all the required loan payments for the Ally account, Plaintiffs are the free and clear owners of the automobile that was the security interest of the Ally account, and the current reporting is a significant misrepresentation of this fully paid and closed account.

47. The accurate reporting of the Ally account would have been to report a payment status of "Current", an account rating of "Paid/Closed", a date of last activity as of the last payment date and should have reported within the creditor remarks section "Auto closed or paid account/zero balance".

48. Within the Tri-Merge credit report, Plaintiff Irma Lazo noticed that Experian reported the following inaccuracies for Plaintiff's Capital One Auto account.

49. The Capital One Auto account was reporting a payment status of "Wage Earner Plan", an account rating of "Derogatory", a blank date of last payment, a date of last activity of February 1, 2020, and within the creditor remarks it was reporting the "Debt included in or discharged through Bankruptcy Chapter 13".

50. This reporting is incorrect because Plaintiffs completed all the required loan payments for the Capital One Auto account and the current reporting is a significant

misrepresentation of this fully paid and closed account.

51. The accurate reporting of the Capital One Auto account would have been to report a payment status of "Current", an account rating of "Paid/Closed", a date of last activity as of the last payment date and should have reported within the creditor remarks section "Auto closed or paid account/zero balance".

52. Within the Tri-Merge credit report, Plaintiffs noticed that Experian reported the following inaccuracies for Plaintiffs' BofA account.

53. The BofA account was reporting a payment status of "Wage Earner Plan", an account rating of "Derogatory", a blank date of last payment, a date of last activity of February 1, 2020, and within the creditor remarks it was reporting the "Debt included in or discharged through Bankruptcy Chapter 13".

54. This reporting is incorrect because Plaintiffs completed all the required loan payments for the BofA account, Plaintiffs are the free and clear owners of the automobile that was the security interest of the BofA account, and the current reporting is a significant misrepresentation of this fully paid and closed account.

55. The accurate reporting of the BofA account would have been to report a payment status of "Current", an account rating of "Paid/Closed", a date of last activity as of the last payment date and should have reported within the creditor remarks section "Auto closed or paid account/zero balance".

56. Within the Tri-Merge credit report, Plaintiffs noticed that Experian reported the following inaccuracies for Plaintiffs' NewRez account.

57. The NewRez account was reporting a payment status of "Wage Earner Plan", an account rating of "Derogatory", a date of last payment of February 28, 2025, a date of last activity

of March 31, 2025, and within the creditor remarks it was reporting the "Chapter 13; wage earner plan account".

58. This reporting is incorrect because Plaintiffs completed all the required loan payments for the NewRez account and the current reporting is a significant misrepresentation of this fully paid and closed account.

59. The accurate reporting of the NewRez account would have been to report a payment status of "Current", an account rating of "Paid/Closed", a date of last activity as of the last payment date and should have reported within the creditor remarks section "Auto closed or paid account/zero balance".

60. The current reporting of the Ally, Capital One Auto, BofA, and NewRez accounts materially misleads lenders to believe Plaintiffs surrendered the propety that was/is the security interest of the Ally, Capital One Auto, BofA, and NewRez accounts and converted the Ally, Capital One Auto, BofA, and NewRez loans to unsecured debt and discharged the debt by way of Plaintiffs' chapter 13 bankruptcy.

61. The current reporting of the Ally, Capital One Auto, BofA, and NewRez accounts was never an "historically accurate" way to report the Ally, Capital One Auto, BofA, and NewRez accounts.

62. Within the Tri-Merge credit report, Plaintiffs noticed that Trans Union reported the following inaccuracies for Plaintiffs' Ally account.

63. The Ally account was reporting a payment status of "Wage Earner Plan", an account rating of "Derogatory", a date of last payment of June 27, 2023, a date of last activity of May 10, 2025, and within the creditor remarks it was reporting the "Chapter 13; wage earner plan account".

64. This reporting is incorrect because Plaintiffs completed all the required loan payments for the Ally account, Plaintiffs are the free and clear owners of the automobile that was the security interest of the Ally account, and the current reporting is a significant misrepresentation of this fully paid and closed account.

65. The accurate reporting of the Ally account would have been to report a payment status of “Current”, an account rating of “Paid/Closed”, a date of last activity as of the last payment date and should have reported within the creditor remarks section “Auto closed or paid account/zero balance”.

66. Within the Tri-Merge credit report, Plaintiff Irma Lazo noticed that Trans Union reported the following inaccuracies for Plaintiffs’ Capital One Auto account.

67. The Capital One Auto account was reporting an account rating of “Derogatory”, a date of last payment of December 20, 2022, a date of last activity of April 18, 2025, and within the creditor remarks it was reporting the “Chapter 13; wage earner plan account”.

68. This reporting is incorrect because Plaintiffs completed all the required loan payments for the Capital One Auto account and the current reporting is a significant misrepresentation of this fully paid and closed account.

69. The accurate reporting of the Capital One Auto account would have been to report an account rating of “Paid/Closed”, a date of last activity as of the last payment date and should have reported within the creditor remarks section “Auto closed or paid account/zero balance”.

70. Within the Tri-Merge credit report, Plaintiffs noticed that Trans Union reported the following inaccuracies for Plaintiffs’ BofA account.

71. The BofA account was reporting an account rating of “Derogatory”, a date of last payment of April 16, 2024, a date of last activity of April 16,2024, and within the creditor remarks

it was reporting the "Chapter 13; wage earner plan account".

72. This reporting is incorrect because Plaintiffs completed all the required loan payments for the BofA account, Plaintiffs are the free and clear owners of the automobile that was the security interest of the BofA account, and the current reporting is a significant misrepresentation of this fully paid and closed account.

73. The accurate reporting of the BofA account would have been to report an account rating of "Paid/Closed", a date of last activity as of the last payment date and should have reported within the creditor remarks section "Auto closed or paid account/zero balance".

74. Within the Tri-Merge credit report, Plaintiffs noticed that Trans Union reported the following inaccuracies for Plaintiffs' NewRez account.

75. The NewRez account was reporting an account rating of "Derogatory", a date of last payment of February 28, 2025, a date of last activity of March 31, 2025, and within the creditor remarks it was reporting the "Chapter 13; wage earner plan account".

76. This reporting is incorrect because Plaintiffs completed all the required loan payments for the NewRez account and the current reporting is a significant misrepresentation of this fully paid and closed account.

77. The accurate reporting of the BofA account would have been to report an account rating of "Paid/Closed", a date of last activity as of the last payment date and should have reported within the creditor remarks section "Auto closed or paid account/zero balance".

78. The current reporting of the Ally, Capital One Auto, BofA, and NewRez accounts materially misleads lenders to believe Plaintiffs surrendered the propety that was/is the security interest of the Ally, Capital One Auto, BofA, and NewRez accounts and converted the Ally, Capital One Auto, BofA, and NewRez loans to unsecured debt and discharged the debt by way

of Plaintiffs' chapter 13 bankruptcy.

79. The current reporting of the Ally, Capital One Auto, BofA, and NewRez accounts was never an "historically accurate" way to report the Ally, Capital One Auto, BofA, and NewRez accounts.

80. On or about March 24, 2026, Plaintiffs sent direct disputes to the CRA Defendant(s) and requested that the CRAs investigate the reporting of the Ally, Capital One Auto, BofA, and NewRez accounts, and Plaintiffs specifically addressed the above referenced issues with the reporting stated in the above Paragraphs. Plaintiffs requested that under the FCRA, the CRAs conduct reasonable investigations and/or remedy the inaccuracies on Plaintiffs' credit reports concerning the accounts.

81. Redacted copies of Plaintiffs' unsigned dispute letters sent to CRAs are attached hereto as Exhibits F, G, H, I, J, and K respectively.

82. Equifax failed to respond to Plaintiffs' disputes.

83. Plaintiffs requested updated consumer reports to see if any changes were made on Plaintiffs' Consumer Reports.

84. Redacted copies of Plaintiffs' updated tri-merge credit reports are each attached hereto as Exhibits L and M.

85. The updated Consumer Report for Noe Lazo Alanis Jr. showed that Equifax made the correction for the Ally account; however, Equifax incorrectly updated the credit report to show as Collection/Chargeoff. The Ally account is not in collections; nor was it charged off.

86. The updated Consumer Reports showed that Equifax made none of the substantive changes Plaintiffs requested in the direct dispute to Equifax and continued to report Irma Lazo's Ally and Capital One Auto accounts inaccurately, and the both Plaintiffs BofA and NewRez

accounts inaccurately.

87. Plaintiff Irma Lazo's Ally account continued to report a payment status of "Wage Earner Plan", an account rating of "Derogatory", a date of last payment of February 1, 2020, a date of last activity of February 1, 2020, a high balance of $0.00, a dispute status of "Account not disputed", and within the creditor remarks it was reporting the "Consumer disputes after resolution Account involved in Chapter 13 debt adj. Included in Chapter 13". Additionally, there were no remarks that this account was disputed.

88. Plaintiff Irma Lazo's Capital One Auto account continued to report a payment status of "Wage Earner Plan", a high balance of $0.00, an account rating of "Derogatory", a date of last payment of February 1, 2020, a date of last activity of February 1, 2020, a dispute status of "Account not disputed", and within the creditor remarks it was reporting "Account previously in dispute – now resolved by data furnisher Account involved in Chapter 13 debt adj. Included in Chapter 13". Additionally, there were no remarks that this account was disputed.

89. Plaintiff Noe Lazo Alanis Jr.'s BofA account continued to report a payment status of "Wage Earner Plan", an account rating of "Derogatory", a high balance of $0.00, a date of last payment of February 1, 2020, a date of last activity of February 1, 2020, a dispute status of "Account not disputed", and within the creditor remarks it was reporting "Account involved in Chapter 13 debt adj. Auto Included in Chapter 13". Additionally, there were no remarks that this account was disputed.

90. Plaintiff Irma Lazo's BofA account continued to report a payment status of "Wage Earner Plan", a high balance of $0.00, a date of last payment of February 1, 2020, a date of last activity of February 1, 2020, a dispute status of "Account not disputed", and within the creditor remarks it was reporting "Account involved in Chapter 13 debt adj. Closed or paid account/zero

balance Included in Chapter 13". Additionally, there were no remarks that this account was disputed.

91. Plaintiff Noe Lazo Alanis Jr.'s NewRez account continued to report a payment status of "Wage Earner Plan", an account rating of "Derogatory", a high balance of $0.00, a date of last payment of February 1, 2020, a date of last activity of February 1, 2020, a dispute status of "Account not disputed", and within the creditor remarks it was reporting "Account involved in Chapter 13 debt adj. Fannie Mae Account Included in Chapter 13". Additionally, there were no remarks that this account was disputed.

92. Plaintiff Irma Lazo's NewRez account continued to report a payment status of "Wage Earner Plan", a high balance of $0.00, a date of last payment of February 1, 2020, a date of last activity of February 1, 2020, a dispute status of "Account not disputed", and within the creditor remarks it was reporting "Account involved in Chapter 13 debt adj. Closed or paid account/zero balance Included in Chapter 13". Additionally, there were no remarks that this account was disputed.

93. Equifax's response, or lack thereof, was not the result of a reasonable investigation into Plaintiff Irma Lazo's dispute and failed to remedy the inaccuracies within the Ally, Capital One Auto, BofA, and NewRez accounts and gave no explanation as to why the Ally, Capital One Auto, BofA, and NewRez accounts were still reporting inaccurately.

94. Plaintiffs' inaccurate Equifax consumer reports were disseminated to third parties before and/or after the instant dispute.

95. The current reporting of the Ally, Capital One Auto, BofA, and NewRez accounts materially misleads lenders to believe Plaintiffs surrendered the property that was the security interest of the Ally, Capital One Auto, BofA, and NewRez accounts and converted the Ally,

Capital One Auto, BofA, and NewRez loans to unsecured debt and discharged the debt by way of Plaintiffs' chapter 13 bankruptcy.

96. Equifax chose to "verify" false information from an unreliable source, failed to correct the inaccurate information, and continued to publish the inaccurate information regarding Plaintiffs' Ally, Capital One Auto, BofA, and NewRez accounts.

97. Upon the Plaintiffs' request to Equifax for verification and correction regarding the Ally, Capital One Auto, BofA, and NewRez accounts, and in accordance with Equifax's standard procedures, Equifax did not evaluate or consider any of Plaintiffs' information, claims or evidence, and did not make any attempt to verify the reporting of the Ally, Capital One Auto, BofA, and NewRez accounts substantially or reasonably.

98. Equifax has adopted the Metro 2 reporting standard, Equifax deviated from the standard based on its conduct in this case, and by Equifax deviating from the adopted standard, Equifax injured Plaintiffs' credit standing.

99. In the alternative, Equifax failed to contact Furnisher Defendant, therefore, failed to perform any investigation at all.

100. In the alternative to the allegation that Equifax failed to contact Furnisher Defendant, it is alleged that Equifax did forward some notice of the dispute to the Furnisher Defendant, and the Furnisher Defendant failed to conduct a lawful investigation.

101. Furnisher Defendant knows how to report the Ally account accurately, and their response to the CRA was willfully reckless.

102. Furnisher Defendant knows the current reporting of the Ally account materially misleads lenders to believe Plaintiffs surrendered the automobile that was the security interest of the Ally account and converted the Ally loan to an unsecured debt and discharged the debt by

way of Plaintiffs' chapter 13 bankruptcy.

103. Furnisher Defendant knows the current reporting of the Ally account was never an "historically accurate" way to report the Ally account.

104. Experian failed to respond to Plaintiffs' disputes, so Plaintiffs requested an updated consumer report to see if any changes were made on Plaintiffs' Consumer Reports. *See* Exhibits L and M.

105. The updated Consumer Reports showed that Experian made none of the substantive changes Plaintiffs requested in the direct dispute to Experian and continued to report the Ally, BofA, NewRez, and Capital One accounts inaccurately.

106. The Ally account continued to report a payment status of "Wage Earner Plan", an account rating of "Derogatory", no date of last payment, a date of last activity of February 1, 2020, a dispute status of "Account not disputed", and within the creditor remarks it was reporting the "Subscriber reports disputes resolved – consumer disagrees. Unpaid balance reported as a loss by credit grantor. Account was in dispute – now resolved – reported by subscriber. Debt included in or discharged through Bankruptcy Chapter 13". Additionally, there were no remarks that this account was disputed.

107. Plaintiff Irma Lazo's Capital One Auto account continued to report a payment status of "Wage Earner Plan", an account rating of "Derogatory", a blank date of last payment, a date of last activity of February 1, 2020, a dispute status of "Account not disputed", and within the creditor remarks it was reporting "Account was in dispute – now resolved – reported by subscriber. Debt included in or discharged through Bankruptcy Chapter 13". Additionally, there were no remarks that this account was disputed.

108. The Plaintiff's' BofA account continued to report a payment status of "Wage

Earner Plan", an account rating of "Derogatory", a blank date of last payment, a date of last activity of February 1, 2020, a dispute status of "Account not disputed", and within the creditor remarks it was reporting "Debt included in or discharged through Bankruptcy Chapter 13". Additionally, there were no remarks that this account was disputed.

109. The Plaintiff's' NewRez account continued to report a payment status of "Wage Earner Plan", an account rating of "Derogatory", a blank date of last payment, a date of last activity of March 1, 2025, a dispute status of "Account not disputed", and within the creditor remarks it was reporting "Debt included in or discharged through Bankruptcy Chapter 13". Additionally, there were no remarks that this account was disputed.

110. Experian's response, or lack thereof, was not the result of a reasonable investigation into Plaintiffs' disputes and failed to remedy the inaccuracies within the Ally, BofA, NewRez, and Capital One accounts and gave no explanation as to why the Ally, BofA, NewRez, and Capital One accounts were still reporting inaccurately.

111. Plaintiffs' inaccurate Experian consumer reports were disseminated to third parties before and/or after the instant dispute.

112. The current reporting of the Ally, BofA, NewRez, and Capital One accounts materially misleads lenders to believe Plaintiffs surrendered the property that was the security interest of the Ally, BofA, NewRez, and Capital One accounts and converted the Ally, BofA, NewRez, and Capital One loans to an unsecured debt and discharged the debt by way of Plaintiffs' chapter 13 bankruptcy.

113. Experian chose to "verify" false information from an unreliable source, failed to correct the inaccurate information, and continued to publish the inaccurate information regarding Plaintiffs' Ally, BofA, NewRez, and Capital One accounts.

114. Upon the Plaintiffs' request to Experian for verification and correction regarding the Ally, BofA, NewRez, and Capital One accounts, and in accordance with Experian's standard procedures, Experian did not evaluate or consider any of Plaintiffs' information, claims or evidence, and did not make any attempt to verify the reporting of the Ally, BofA, NewRez, and Capital One accounts substantially or reasonably.

115. Experian has adopted the Metro 2 reporting standard, Experian deviated from the standard based on its conduct in this case, and by Experian deviating from the adopted standard, Experian injured Plaintiffs' credit standing.

116. In the alternative, Experian failed to contact Furnisher Defendant, and therefore, failed to perform any investigation at all.

117. In the alternative to the allegation that Experian failed to contact Furnisher Defendant, it is alleged that Experian did forward some notice of the dispute to the Furnisher Defendant, and the Furnisher Defendant failed to conduct a lawful investigation.

118. Furnisher Defendant knows how to report the Ally account accurately, and their response to the CRA was willfully reckless.

119. Furnisher Defendant knows the current reporting of the Ally account materially misleads lenders to believe Plaintiffs surrendered the automobile that was the security interest of the Ally account and converted the Ally loan to an unsecured debt and discharged the debt by way of Plaintiffs' chapter 13 bankruptcy.

120. Furnisher Defendant knows the current reporting of the Ally account was never an "historically accurate" way to report the Ally account.

121. Trans Union responded to Plaintiff Irma Lazo's dispute on May 26, 2026.

122. A redacted copy of Trans Union's response to Irma Lazo is attached hereto as

Exhibit N.

123. Trans Union failed to respond to Plaintiff Noe Lazo Alanis Jr.'s dispute.

124. Plaintiffs requested updated consumer report to see if any changes were made on Plaintiffs' Consumer Reports. *See* Exhibits L and M.

125. Trans Union's Irma Lazo response and the updated Consumer Reports showed that Trans Union made none of the substantive changes Plaintiffs requested in the direct dispute to Trans Union and continued to report Noe Lazo Alanis Jr.'s BofA and Irma Lazo's Capital One Auto accounts inaccurately, and deleted the Plaintiffs Ally and NewRez accounts and Irma Lazo's BofA account without explanation or reasons for an outright deletion.

126. Plaintiff Noe Lazo Alanis Jr.'s BofA account continued to report an account rating of "Derogatory", a date of last payment of April 16, 2024, a date of last activity of April 16,2024, and within the creditor remarks it was reporting the "Chapter 13; wage earner plan account". "Account involved in Chapter 13 debt adj. Auto Included in Chapter 13". Additionally, there were no remarks that this account was disputed.

127. Plaintiff Irma Lazo's Capital One Auto account continued to report an account rating of "Derogatory", a date of last payment of December 20, 2022, a date of last activity of April 18, 2025, and within the creditor remarks it was reporting the "Chapter 13; wage earner plan account". Additionally, there were no remarks that this account was disputed.

128. Trans Union's response, or lack thereof, was not the result of a reasonable investigation into Plaintiff's dispute and failed to remedy the inaccuracies within the Ally, Capital One, BofA. And NerRz accounts and gave no explanation as to why Noe Lazo Alanis Jr.'s BofA account and Irma Lazo's Capital One Auto account were still reporting inaccurately or why Plaintiffs NewRez accounts and Irma Lazo's BofA account were deleted.

129. Plaintiff's inaccurate Trans Union consumer report was disseminated to third parties before and/or after the instant dispute.

130. The current reporting of Noe Lazo Alanis Jr.'s BofA account and Irma Lazo's Capital One Auto account materially misleads lenders to believe Plaintiffs surrendered the automobile that was the security interest of Noe Lazo Alanis Jr.'s BofA account and Irma Lazo's Capital One Auto account and converted the BofA and Capital One loans to an unsecured debt and discharged the debt by way of Plaintiffs' chapter 13 bankruptcy.

131. Trans Union chose to "verify" false information from an unreliable source, failed to correct the inaccurate information, and continued to publish the inaccurate information regarding Plaintiffs' BofA and Capital One accounts.

132. Upon the Plaintiffs' request to Trans Union for verification and correction regarding Noe Lazo Alanis Jr.'s BofA account and Irma Lazo's Capital One Auto account, and in accordance with Trans Union's standard procedures, Trans Union did not evaluate or consider any of Plaintiff's information, claims or evidence, and did not make any attempt to verify the reporting of Noe Lazo Alanis Jr.'s BofA account and Irma Lazo's Capital One Auto account substantially or reasonably.

133. Additionally, upon the Plaintiffs' request to Trans Union to verify and correct the Plaintiffs Ally and NewRez accounts, and Irma Lazo's BofA account, and in accordance with Trans Union's standard procedures, as well as the FCRA, because Trans Union ignored the evidence Plaintiff included with Plaintiff's dispute letter and unilaterally deleted the Plaintiffs Ally and NewRez accounts, and Irma Lazo's BofA account from Plaintiffs' Consumer Report.

134. Trans Union seemingly saw the word "Bankruptcy" in Plaintiffs' dispute letter and unilaterally decided to delete the Plaintiffs Ally and NewRez accounts, and Irma Lazo's BofA

account and not even attempt to contact the furnisher of credit information.

135. Trans Union simply ignored Plaintiffs' request to involve Plaintiffs' lender for the Plaintiffs Ally and NewRez accounts, and Irma Lazo's BofA account and did not evaluate or consider the actual status of these accounts and lazily deleted the Plaintiffs Ally and NewRez accounts, and Irma Lazo's BofA account without any explanation.

136. Trans Union's willful failure to involve Ally, NewRez, and BofA in Plaintiffs' FCRA dispute is a willful violation of the Fair Credit Reporting Act (FCRA) under § 1681i(a)(2). The FCRA required Trans Union to promptly notify Ally, NewRez, and BofA of the dispute and provide all relevant information it received from Plaintiffs for Ally, NewRez, and BofA to investigate.

137. Trans Union willfully decided to keep Plaintiff's dispute to themselves and deleted the Plaintiffs Ally and NewRez accounts, and Irma Lazo's BofA account without perform any investigation at all.

138. Trans Union's failure to investigate Plaintiff's dispute letter, its failure to include Ally, NewRez, and BofA in the dispute process, and its willful actions have injured Plaintiff's credit standing.

139. In the alternative to the allegation that Trans Union failed to contact Furnisher Defendant, it is alleged that Trans Union did forward some notice of the dispute to the Furnisher Defendant, and the Furnisher Defendant failed to conduct a lawful investigation.

140. Trans Union has adopted the Metro 2 reporting standard, Trans Union deviated from the standard based on its conduct in this case, and by Trans Union deviating from the adopted standard, Trans Union injured Plaintiff's credit standing.

141. In the alternative, Trans Union failed to contact Furnisher Defendant, therefore,

failed to perform any investigation at all.

142. In the alternative to the allegation that Trans Union failed to contact Furnisher Defendant, it is alleged that Trans Union did forward some notice of the dispute to the Furnisher Defendant, and the Furnisher Defendant failed to conduct a lawful investigation.

143. Furnisher Defendant knows how to report the Ally account accurately, and their response to the CRA was willfully reckless.

144. Furnisher Defendant knows the current reporting of the Ally account materially misleads lenders to believe Plaintiff surrendered the automobile that was the security interest of the Ally account and converted the Ally loan to an unsecured debt and discharged the debt by way of Plaintiff's chapter 13 bankruptcy.

145. Furnisher Defendant knows the current reporting of the Ally account was never an "historically accurate" way to report the Ally account.

## V. GROUNDS FOR RELIEF

### EQUIFAX'S VIOLATION OF THE FCRA
### (15 U.S.C. §1681e(b))

146. The Plaintiffs reallege and incorporate all paragraphs above as if fully set out herein.

147. Equifax violated 15 U.S.C. § 1681e(b) by failing to establish or follow reasonable procedures to assure maximum possible accuracy in the preparation of the credit reports and credit files it published and maintained concerning the Plaintiffs.

148. The FCRA mandates that "[w]henever a consumer reporting agency prepares a consumer report it shall follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates." 15 U.S.C. § 168le(b)

(emphasis added).

149. Equifax knew or should have known of Plaintiffs' bankruptcy status, history, and/or payment history were reporting inaccurately, and yet, Equifax continued to prepare a patently false consumer report concerning Plaintiffs.

150. Despite actual and implied knowledge that Plaintiffs' credit report was and/or is not accurate, Equifax readily provided false reports to one or more third parties, thereby misrepresenting Plaintiffs, and ultimately Plaintiffs' creditworthiness.

151. After Equifax knew or should have known Plaintiffs' bankruptcy status, history, and/or payment history were inaccurate for Plaintiffs' Ally, Capital One Auto, BofA, and NewRez tradelines, it failed to make the corrections as would be required to attain "maximum possible accuracy of the information concerning the individual about whom the report relates." 15 U.S.C. § 168le(b).

152. As a result of Equifax's conduct, action, and inaction, the Plaintiffs suffered damages, including, but not limited to: loss in Plaintiffs' abilities to finance goods; loss of credit, loss of the abilities to purchase and benefit from credit; emotional anguish, frustration, and annoyance from being deterred from applying for credit; mental anguish, humiliation, anger, frustration, annoyance, and embarrassment as a result of the publication of false information; lost credit capacity and decreased credit scores; damage to reputation; mental anguish, emotional distress, frustration, humiliation, and annoyance as a result of being burdened with a false credit reporting history; lost opportunities to obtain credit in the form of an unspecified number of credit offers that Plaintiffs did not receive because of the false and derogatory information contained in Plaintiffs' credit reports; Plaintiffs' lowered credit score may have impacted the interest rates Plaintiffs have on current loans; Plaintiffs' lowered credit score may have impacted the interest

rates Plaintiffs received during this ordeal; Plaintiffs' lowered credit score may have impacted the credit limits Plaintiffs have on existing accounts; Plaintiffs spent considerable time, effort, and expense attempting to force Defendant to comply with Defendant's statutory obligations, including but not limited to reviewing information online, telephone calls, emails, writing letters, sending letters, and attempting to decipher letters, reports, and other instruments provided by Defendant; loss of self-esteem because of Defendant's continued persistence in painting Plaintiffs in a false light both personally and financially; anxiety when considering seeking additional credit because Plaintiffs believe Plaintiffs will be forced to be subjected to the humiliation of having to explain the false and defamatory information; and the costs and time Plaintiffs have spent trying to repair Plaintiffs' credit in light of the damage done to it continuously by Defendant.

153. Equifax's conduct, action, and inaction, were willful, rendering it liable for punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 168ln. In the alternative, such conduct, action, and inaction were negligent, entitling the Plaintiffs to recover under 15 U.S.C. § 1681o.

154. The Plaintiffs are entitled to recover costs and attorney's fees from Equifax in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681o.

**EQUIFAX'S VIOLATION OF THE FCRA**
**(15 U.S.C. §1681i)**

155. The Plaintiffs reallege and incorporate all paragraphs above as if fully set out herein.

156. Equifax violated 15 U.S.C. § 1681i on multiple occasions by failing to update or correct inaccurate information in the Plaintiffs' credit files after receiving actual notice of such inaccuracies, failing to conduct a lawful reinvestigation, failing to forward all relevant information

to furnisher(s), failing to maintain reasonable procedures with which to filter and verify disputed information in the Plaintiffs' credit files, and relying upon verification from a source it has reason to know is unreliable.

157. As a result of Equifax's conduct, action, and inaction, the Plaintiffs suffered damages, including, but not limited to: loss in Plaintiffs' abilities to finance goods; loss of credit, loss of the abilities to purchase and benefit from credit; emotional anguish, frustration, and annoyance from being deterred from applying for credit; mental anguish, humiliation, anger, frustration, annoyance, and embarrassment as a result of the publication of false information; lost credit capacity and decreased credit scores; damage to reputation; mental anguish, emotional distress, frustration, humiliation, and annoyance as a result of being burdened with a false credit reporting history; lost opportunities to obtain credit in the form of an unspecified number of credit offers that Plaintiffs did not receive because of the false and derogatory information contained in Plaintiffs' credit reports; Plaintiffs' lowered credit score may have impacted the interest rates Plaintiffs have on current loans; Plaintiffs' lowered credit score may have impacted the interest rates Plaintiffs received during this ordeal; Plaintiffs' lowered credit scores may have impacted the credit limits Plaintiffs have on existing accounts; Plaintiffs spent considerable time, effort, and expense attempting to force Defendant to comply with Defendant's statutory obligations, including but not limited to reviewing information online, telephone calls, emails, writing letters, sending letters, and attempting to decipher letters, reports, and other instruments provided by Defendant; loss of self-esteem because of Defendant's continued persistence in painting Plaintiffs in a false light both personally and financially; anxiety when considering seeking additional credit because Plaintiffs believe Plaintiffs will be forced to be subjected to the humiliation of having to explain the false and defamatory information; and the costs and time Plaintiffs have spent trying

to repair Plaintiffs' credit in light of the damage done to it continuously by Defendant.

158. Equifax's conduct, action, and inaction, were willful, rendering it liable for actual or statutory damages, and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. In the alternative, such conduct, action, and inaction were negligent entitling the Plaintiffs to recover actual damages under 15 U.S.C. § 1681o.

159. The Plaintiffs are entitled to recover costs and attorney's fees from Equifax in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or 1681o.

**EXPERIAN'S VIOLATION OF THE FCRA**
**(15 U.S.C. §1681e(b))**

160. The Plaintiffs reallege and incorporate all paragraphs above as if fully set out herein.

161. Experian violated 15 U.S.C. § 1681e(b) by failing to establish or follow reasonable procedures to assure maximum possible accuracy in the preparation of the credit reports and credit files it published and maintained concerning the Plaintiffs.

162. The FCRA mandates that "[w]henever a consumer reporting agency prepares a consumer report it shall follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates." 15 U.S.C. § 168le(b) (emphasis added).

163. Experian knew or should have known of Plaintiffs' bankruptcy status, history, and/or payment history were reporting inaccurately, and yet, Experian continued to prepare a patently false consumer report concerning Plaintiffs.

164. Despite actual and implied knowledge that Plaintiffs' credit report was and/or is not accurate, Experian readily provided false reports to one or more third parties, thereby

misrepresenting Plaintiffs, and ultimately Plaintiffs' creditworthiness.

165. After Experian knew or should have known Plaintiffs' bankruptcy status, history, and/or payment history were inaccurate for Plaintiffs' Ally, Capital One Auto, BofA, and NewRez tradelines, it failed to make the corrections as would be required to attain "maximum possible accuracy of the information concerning the individual about whom the report relates." 15 U.S.C. § 168le(b).

166. As a result of Experian's conduct, action, and inaction, the Plaintiffs suffered damages, including, but not limited to: loss in Plaintiffs' abilities to finance goods; loss of credit, loss of the abilities to purchase and benefit from credit; emotional anguish, frustration, and annoyance from being deterred from applying for credit; mental anguish, humiliation, anger, frustration, annoyance, and embarrassment as a result of the publication of false information; lost credit capacity and decreased credit scores; damage to reputation; mental anguish, emotional distress, frustration, humiliation, and annoyance as a result of being burdened with a false credit reporting history; lost opportunities to obtain credit in the form of an unspecified number of credit offers that Plaintiffs did not receive because of the false and derogatory information contained in Plaintiffs' credit reports; Plaintiffs' lowered credit score may have impacted the interest rates Plaintiffs have on current loans; Plaintiffs' lowered credit score may have impacted the interest rates Plaintiffs received during this ordeal; Plaintiffs' lowered credit score may have impacted the credit limits Plaintiffs have on existing accounts; Plaintiffs spent considerable time, effort, and expense attempting to force Defendant to comply with Defendant's statutory obligations, including but not limited to reviewing information online, telephone calls, emails, writing letters, sending letters, and attempting to decipher letters, reports, and other instruments provided by Defendant; loss of self-esteem because of Defendant's continued persistence in painting Plaintiffs

in a false light both personally and financially; anxiety when considering seeking additional credit because Plaintiffs believe Plaintiffs will be forced to be subjected to the humiliation of having to explain the false and defamatory information; and the costs and time Plaintiffs have spent trying to repair Plaintiffs' credit in light of the damage done to it continuously by Defendant.

167. Experian's conduct, action, and inaction, were willful, rendering it liable for punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 168ln. In the alternative, such conduct, action, and inaction were negligent, entitling the Plaintiffs to recover under 15 U.S.C. § 1681o.

168. The Plaintiffs are entitled to recover costs and attorney's fees from Experian in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681o.

**EXPERIAN'S VIOLATION OF THE FCRA**
**(15 U.S.C. §1681i)**

169. The Plaintiffs reallege and incorporate all paragraphs above as if fully set out herein.

170. Experian violated 15 U.S.C. § 1681i on multiple occasions by failing to update or correct inaccurate information in the Plaintiffs' credit files after receiving actual notice of such inaccuracies, failing to conduct a lawful reinvestigation, failing to forward all relevant information to furnisher(s), failing to maintain reasonable procedures with which to filter and verify disputed information in the Plaintiffs' credit files, and relying upon verification from a source it has reason to know is unreliable.

171. As a result of Experian's conduct, action, and inaction, the Plaintiffs suffered damages, including, but not limited to: loss in Plaintiffs' abilities to finance goods; loss of credit, loss of the abilities to purchase and benefit from credit; emotional anguish, frustration, and

annoyance from being deterred from applying for credit; mental anguish, humiliation, anger, frustration, annoyance, and embarrassment as a result of the publication of false information; lost credit capacity and decreased credit scores; damage to reputation; mental anguish, emotional distress, frustration, humiliation, and annoyance as a result of being burdened with a false credit reporting history; lost opportunities to obtain credit in the form of an unspecified number of credit offers that Plaintiffs did not receive because of the false and derogatory information contained in Plaintiffs' credit reports; Plaintiffs' lowered credit score may have impacted the interest rates Plaintiffs have on current loans; Plaintiffs' lowered credit score may have impacted the interest rates Plaintiffs received during this ordeal; Plaintiffs' lowered credit scores may have impacted the credit limits Plaintiffs have on existing accounts; Plaintiffs spent considerable time, effort, and expense attempting to force Defendant to comply with Defendant's statutory obligations, including but not limited to reviewing information online, telephone calls, emails, writing letters, sending letters, and attempting to decipher letters, reports, and other instruments provided by Defendant; loss of self-esteem because of Defendant's continued persistence in painting Plaintiffs in a false light both personally and financially; anxiety when considering seeking additional credit because Plaintiffs believe Plaintiffs will be forced to be subjected to the humiliation of having to explain the false and defamatory information; and the costs and time Plaintiffs have spent trying to repair Plaintiffs' credit in light of the damage done to it continuously by Defendant.

172. Experian's conduct, action, and inaction, were willful, rendering it liable for actual or statutory damages, and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. In the alternative, such conduct, action, and inaction were negligent entitling the Plaintiffs to recover actual damages under 15 U.S.C. § 1681o.

173. The Plaintiffs are entitled to recover costs and attorney's fees from Experian in an

amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or 1681o.

**TRANS UNION'S VIOLATION OF THE FCRA**
**(15 U.S.C. §1681e(b))**

174. The Plaintiffs reallege and incorporate all paragraphs above as if fully set out herein.

175. Trans Union violated 15 U.S.C. § 1681e(b) by failing to establish or follow reasonable procedures to assure maximum possible accuracy in the preparation of the credit reports and credit files it published and maintained concerning the Plaintiffs.

176. The FCRA mandates that "[w]henever a consumer reporting agency prepares a consumer report it shall follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates." 15 U.S.C. § 168le(b) (emphasis added).

177. Trans Union knew or should have known of Plaintiffs' bankruptcy status, history, and/or payment history were reporting inaccurately, and yet, Trans Union continued to prepare a patently false consumer report concerning Plaintiffs.

178. Despite actual and implied knowledge that Plaintiffs' credit report was and/or is not accurate, Trans Union readily provided false reports to one or more third parties, thereby misrepresenting Plaintiffs, and ultimately Plaintiffs' creditworthiness.

179. After Trans Union knew or should have known Plaintiffs' bankruptcy status, history, and/or payment history were inaccurate for Plaintiffs' Ally, Capital One Auto, BofA, and NewRez tradelines, it failed to make the corrections as would be required to attain "maximum possible accuracy of the information concerning the individual about whom the report relates." 15 U.S.C. § 168le(b).

180. As a result of Trans Union's conduct, action, and inaction, the Plaintiffs suffered damages, including, but not limited to: loss in Plaintiffs' abilities to finance goods; loss of credit, loss of the abilities to purchase and benefit from credit; emotional anguish, frustration, and annoyance from being deterred from applying for credit; mental anguish, humiliation, anger, frustration, annoyance, and embarrassment as a result of the publication of false information; lost credit capacity and decreased credit scores; damage to reputation; mental anguish, emotional distress, frustration, humiliation, and annoyance as a result of being burdened with a false credit reporting history; lost opportunities to obtain credit in the form of an unspecified number of credit offers that Plaintiffs did not receive because of the false and derogatory information contained in Plaintiffs' credit reports; Plaintiffs' lowered credit score may have impacted the interest rates Plaintiffs have on current loans; Plaintiffs' lowered credit score may have impacted the interest rates Plaintiffs received during this ordeal; Plaintiffs' lowered credit score may have impacted the credit limits Plaintiffs have on existing accounts; Plaintiffs spent considerable time, effort, and expense attempting to force Defendant to comply with Defendant's statutory obligations, including but not limited to reviewing information online, telephone calls, emails, writing letters, sending letters, and attempting to decipher letters, reports, and other instruments provided by Defendant; loss of self-esteem because of Defendant's continued persistence in painting Plaintiffs in a false light both personally and financially; anxiety when considering seeking additional credit because Plaintiffs believe Plaintiffs will be forced to be subjected to the humiliation of having to explain the false and defamatory information; and the costs and time Plaintiffs have spent trying to repair Plaintiffs' credit in light of the damage done to it continuously by Defendant.

181. Trans Union's conduct, action, and inaction, were willful, rendering it liable for punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 168ln. In

the alternative, such conduct, action, and inaction were negligent, entitling the Plaintiffs to recover under 15 U.S.C. § 1681o.

182. The Plaintiffs are entitled to recover costs and attorney's fees from Trans Union in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681o.

**TRANS UNION'S VIOLATION OF THE FCRA**
**(15 U.S.C. §1681i)**

183. The Plaintiffs reallege and incorporate all paragraphs above as if fully set out herein.

184. Trans Union violated 15 U.S.C. § 1681i on multiple occasions by failing to update or correct inaccurate information in the Plaintiffs' credit files after receiving actual notice of such inaccuracies, failing to conduct a lawful reinvestigation, failing to forward all relevant information to furnisher(s), failing to maintain reasonable procedures with which to filter and verify disputed information in the Plaintiffs' credit files, and relying upon verification from a source it has reason to know is unreliable.

185. As a result of Trans Union's conduct, action, and inaction, the Plaintiffs suffered damages, including, but not limited to: loss in Plaintiffs' abilities to finance goods; loss of credit, loss of the abilities to purchase and benefit from credit; emotional anguish, frustration, and annoyance from being deterred from applying for credit; mental anguish, humiliation, anger, frustration, annoyance, and embarrassment as a result of the publication of false information; lost credit capacity and decreased credit scores; damage to reputation; mental anguish, emotional distress, frustration, humiliation, and annoyance as a result of being burdened with a false credit reporting history; lost opportunities to obtain credit in the form of an unspecified number of credit offers that Plaintiffs did not receive because of the false and derogatory information contained in

Plaintiffs' credit reports; Plaintiffs' lowered credit score may have impacted the interest rates Plaintiffs have on current loans; Plaintiffs' lowered credit score may have impacted the interest rates Plaintiffs received during this ordeal; Plaintiffs' lowered credit scores may have impacted the credit limits Plaintiffs have on existing accounts; Plaintiffs spent considerable time, effort, and expense attempting to force Defendant to comply with Defendant's statutory obligations, including but not limited to reviewing information online, telephone calls, emails, writing letters, sending letters, and attempting to decipher letters, reports, and other instruments provided by Defendant; loss of self-esteem because of Defendant's continued persistence in painting Plaintiffs in a false light both personally and financially; anxiety when considering seeking additional credit because Plaintiffs believe Plaintiffs will be forced to be subjected to the humiliation of having to explain the false and defamatory information; and the costs and time Plaintiffs have spent trying to repair Plaintiffs' credit in light of the damage done to it continuously by Defendant.

186. Trans Union's conduct, action, and inaction, were willful, rendering it liable for actual or statutory damages, and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. In the alternative, such conduct, action, and inaction were negligent entitling the Plaintiffs to recover actual damages under 15 U.S.C. § 1681o.

187. The Plaintiffs are entitled to recover costs and attorney's fees from Trans Union in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or 1681o.

**ALLY'S VIOLATION OF THE FCRA**
**(15 U.S.C. §1681s-2(b))**

188. The Plaintiffs reallege and incorporate all paragraphs above as if fully set out herein.

189. Furnisher Defendant violated 15 U.S.C. § 1681s-2(b) by failing to conduct

reasonable investigations upon receiving notice of Plaintiffs' dispute(s) from one or more consumer reporting agencies, and/or failing to appropriately report the results of their investigations, and/or failing to appropriately modify the information.

190. Furnisher Defendant further violated 15 U.S.C. § 1681s-2(b) by continuing to report the Ally Tradeline(s) within Plaintiffs' credit files with the CRA Defendants without also including a notation that this debt was disputed, failing to fully and properly investigate the Plaintiffs' disputes of the Ally Tradeline(s), failing to accurately respond to the CRA Defendants, failing to correctly report results of an accurate investigation to every other consumer reporting agency, and failing to permanently and lawfully correct its own internal records to prevent the re-reporting of inaccurate information to the Ally Tradeline(s) within the consumer reporting agencies reports.

191. As a result of Furnisher Defendant's conduct, action, and inaction, the Plaintiffs suffered damages, including, but not limited to: loss in Plaintiffs' ability to finance goods; loss of credit, loss of the ability to purchase and benefit from credit; emotional anguish, frustration, and annoyance from being deterred from applying for credit; mental anguish, humiliation, anger, frustration, annoyance, and embarrassment as a result of the publication of false information; lost credit capacity and decreased credit scores; damage to reputation; mental anguish, emotional distress, frustration, humiliation, and annoyance as a result of being burdened with a false credit reporting history; lost opportunities to obtain credit in the form of an unspecified number of credit offers that Plaintiffs did not receive because of the false and derogatory information contained in Plaintiffs' credit reports; Plaintiffs' lowered credit score may have impacted the interest rates Plaintiffs have on current loans; Plaintiffs' lowered credit scores may have impacted the interest rates Plaintiffs received during this ordeal; Plaintiffs' lowered credit score may have impacted

the credit limits Plaintiffs have on existing accounts; Plaintiffs spent considerable time, effort, and expense attempting to force Defendant to comply with Defendant's statutory obligations, including but not limited to reviewing information online, telephone calls, emails, writing letters, sending letters, and attempting to decipher letters, reports, and other instruments provided by Defendant; loss of self-esteem because of Defendant's continued persistence in painting Plaintiffs in a false light both personally and financially; anxiety when considering seeking additional credit because Plaintiffs believe Plaintiffs will be forced to be subjected to the humiliation of having to explain the false and defamatory information; and the costs and time Plaintiffs have spent trying to repair Plaintiff's credit in light of the damage done to it continuously by Defendant.

192. Furnisher Defendant's conduct, action, and inaction, were willful, rendering it liable for actual or statutory, and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. In the alternative, it was negligent entitling the Plaintiffs to recover actual damages under 15 U.S.C. § 1681o.

## VI. VICARIOUS LIABILITY/RESPONDEAT SUPERIOR

193. Plaintiffs will be able to show, after reasonable discovery, that all actions at issue were taken by employees, agents, servants, or representatives, of any type, for Defendants, the principals, within the line and scope of such individuals' (or entities') express or implied authority, through employment, agency, or representation, which imputes liability to Defendants for all such actions under the doctrine of respondent superior and/or vicarious liability.

## VII. DAMAGES

194. Plaintiffs respectfully request that this Honorable Court instruct the jury, as the trier of facts, that in addition to actual or compensatory damages, punitive or exemplary damages may be awarded against the Defendants under the provisions of the FCRA and/or states' laws,

including Michigan.

195. Plaintiffs respectfully request that this Honorable Court award Plaintiffs' litigation expenses and other costs of litigation and reasonable attorney's fees incurred in this litigation, in accordance with the provisions of the FCRA and/or other laws.

196. The above and foregoing actions, inactions, and fault of Defendants, as to each and every claim, have proximately caused a wide variety of damages to Plaintiffs.

197. Defendants performed perfunctory and essentially useless reinvestigations resulting in the verification of false reportings about the Plaintiffs and have been a substantial factor in causing credit denials and other damages.

198. Plaintiffs suffered a variety of damages, including economic and non-economic damages as prayed for herein.

199. Defendants have negligently and/or willfully violated various provisions of the FCRA and are thereby liable unto Plaintiffs.

200. Defendants are liable unto Plaintiffs for all actual, statutory, exemplary and punitive damages awarded in this case, as well as other demands and claims asserted herein including, but not limited to: out-of-pocket expenses; credit denials; loss in Plaintiffs' ability to finance goods; loss of credit, loss of the ability to purchase and benefit from credit; emotional anguish, frustration, and annoyance from being deterred from applying for credit; mental anguish, humiliation, anger, frustration, annoyance, and embarrassment as a result of the publication of false information; lost credit capacity and decreased credit scores; damage to reputation; mental anguish, emotional distress, frustration, humiliation, and annoyance as a result of being burdened with a false credit reporting history; lost opportunities to obtain credit in the form of an unspecified number of credit offers that Plaintiffs did not receive because of the false and derogatory

information contained in Plaintiffs' credit reports; Plaintiffs' lowered credit scores may have impacted the interest rates Plaintiffs have on current loans; Plaintiffs' lowered credit score may have impacted the interest rates Plaintiffs received during this ordeal; Plaintiffs' lowered credit score may have impacted the credit limits Plaintiffs have on existing accounts; Plaintiffs spent considerable time, effort, and expense attempting to force Defendants to comply with Defendants' statutory obligations, including but not limited to reviewing information online, telephone calls, emails, writing letters, sending letters, and attempting to decipher letters, reports, and other instruments provided by Defendants; loss of self-esteem because of Defendants' continued persistence in painting Plaintiffs in a false light both personally and financially; anxiety when considering seeking additional credit because Plaintiffs believes Plaintiffs will be forced to be subjected to the humiliation of having to explain the false and defamatory information; the costs and time Plaintiffs have spent trying to repair Plaintiffs' credit in light of the damage done to it continuously by Defendants; attorney's fees; court costs; and other assessments proper by law and any and all other applicable federal and state laws, together with legal interest thereon from date of judicial demand until paid.

**WHEREFORE PREMESIS CONSIDERED**, Plaintiffs pray that this Honorable Court:

A. Enter Judgment in favor of Plaintiffs and against Defendants Equifax Information Services LLC, Experian Information Solutions, Inc., and Trans Union LLC, jointly, severally, and in solido, for all reasonable damages sustained by Plaintiffs, including, but not limited to, actual damages, compensatory damages, out-of-pocket expenses, credit denials, costs and time of repairing Plaintiffs' credit, pain and suffering, embarrassment, inconvenience, lost economic opportunity, loss of incidental time, frustration, emotional distress, mental anguish, and fear of personal and financial safety and security for Defendants' violations of the FCRA, applicable state law, and

common law;

B. Find that the appropriate circumstances exist for an award of punitive damages to Plaintiffs;

C. Award Plaintiffs pre-judgment and post-judgment interest, as allowed by law;

D. Order that CRA Defendants, Equifax Information Services LLC, Experian Information Solutions, Inc., and Trans Union LLC, work in conjunction, cooperatively, and/or individually to reinvestigate and correct the consumer report(s), credit report(s), data emanations, consumer histories, and credit histories of and concerning Plaintiffs and/or any of Plaintiffs' personal identifiers.

E. Grant such other and further relief, in law or equity, to which Plaintiffs might show Plaintiffs are justly entitled.

Date Filed: August 21, 2026

Respectfully submitted,

*/s/ Blake R. Bauer*

Blake R. Bauer
MN Bar Number 0396262
FCRA-TX@fieldslaw.com
FIELDS LAW FIRM
9999 Wayzata Blvd.
Minnetonka, Minnesota 55305
(612) 383-1868 (telephone)
(612) 370-4256 (fax)

***COUNSEL FOR PLAINTIFFS***

## JURY DEMAND

Plaintiffs hereby demand a trial by jury on all issues so triable.

August 21, 2026 | */s/ Blake R. Bauer*
Date | Blake R. Bauer